*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PAULA SOVA,

Plaintiff-Appellant,

v

ADVISACARE HEALTHCARE SOLUTIONS,
INC. and MICHELE DUBEY,

Defendants-Appellees.

UNPUBLISHED
August 19, 2021

No. 353912
Emmet Circuit Court
LC No. 19-106535-NZ

Before: STEPHENS, P.J., and BORRELLO and GLEICHER, JJ.

PER CURIAM.

Advisacare Healthcare Solutions, Inc. (AHS) terminated Paula Sova's employment as a home healthcare aide based on her lack of professionalism, violation of her employment contract, and the requests of two clients to remove Sova from their care. Sova filed suit under the Whistleblowers' Protection Act (WPA), MCL 15.369 *et seq.*, alleging that AHS actually retaliated against her for filing a report with the state about the abuse of a client. Sova has not created a genuine issue of material fact that AHS's cited reasons for her termination were mere pretext. Sova's own deposition testimony revealed that her termination was justified. The circuit court properly dismissed Sova's claims, and we affirm.

## I. BACKGROUND

Paula Sova was hired as a home healthcare aide by AHS in December 2017. Sova initially provided care for clients at the Petoskey American House. AHS serviced 34 clients at the facility. The American House CEO requested that Sova be "removed from providing care for clients" at that facility. Sova's supervisor, Michele Dubey informed her that "the head of the American House did not want [her] there," although she did not explain why. Sova tried to create questions of fact throughout these proceedings by making inconsistent and contradictory statements. At her deposition, Sova both admitted that Dubey notified her of the American House decision, but also claimed that she "was never told that" she was not "welcome back at American House."

AHS reassigned Sova to provide in-home services first to "Jen" in Petoskey, and then to VD, a man who had suffered an on-the-job brain injury. While working in VD's home, Sova came

-1-

to believe that his guardian and conservator were "abusing" him. Specifically, VD's sister, his guardian, sent him text messages infused with vulgarity and insults.[1] Sova indicated that VD's guardian "never went and saw him." Sova was also concerned that VD's conservator, his ex-girlfriend, "wouldn't let him have money for food and stuff like that." On one occasion, VD received "a shutoff notice for something," and the conservator told him, "Well, I'll pay it when I pay it." Sova described that VD wanted to go into the community and do things, but that the conservator would not give him money for activities. Sova believed VD had enough money "[b]ecause he said he had money," but admitted that she really had no knowledge of his financial status. Sova further described that VD's guardian required the caregivers to keep notes about his telephone calls and visitors, alcohol use, and his other activities, which Sova viewed as overreaching and a violation of VD's privacy.[2] Sova admitted that she never voiced her concern to her AHS supervisor. And Sova admitted that no one had physically abused VD.

On September 9, 2018, Sova sent an email complaint to the Bureau of Community and Health Systems to report alleged abuse. The brief message stated:

> Hello my name is Paula sova [sic] and I'm a caregiver for [VD], who is unalleged [sic] incapacitated individual monetered [sic] by the emmet county probate court. I'am [sic] actually employed by ADVISACARE. I write to inform that [VD] has and is being abused. Infact [sic], it's gotten to the point where I can no longer play a part in the abuse. There are to [sic] many details to write out here. I firmly believe that [VD's] constitutional rights are being violated, almost on a daily bases [sic].
>
> I am now worried that I may be fired because of this. Please contact me at your earliest convenience.thank [sic] you.

Sova forwarded the email to Dubey after filing it. Sova did not hear from the state agency and followed up by phone. Sova asserted, "They informed me that they were processing my complaint," but that she never heard anything.

Sova attested that after she made this report, she "was treated differently by other health care aides who seemed to avoid me and not communicate with me on-the-job as normally was the case before" making the report. Sova never explained how her supervisor or AHS caused this rift.

---

[1] VD was apparently angry with his sister for securing a court order preventing him from speaking to "Jessica." In a string of text messages, the guardian advised VD that the court ordered the end to their contact, not her. The guardian called VD an "idiot" and "a dumb ass," and told VD to "fuck off," "You can go straight to hell im tired of dealing with you and all of your bullshit," "I didn't ruin Jessica's life. She did it to herself," and "So you both can fuck off. Don't you EVER TEXT ME AGAIN. I'm done." "Jessica" apparently refers to a former Advisacare home healthcare aide who left the company after becoming romantically involved with VD.

[2] The caregivers also kept notes in a second book to communicate regarding VD's care. Sova had no concerns with that journal.

Approximately one week after Sova made her report, AHS reduced her pay from $13.50 to $9.25 an hour. Sova alleged that this pay cut was an act of retaliation. Sova claimed that AHS gave her no explanation for this pay reduction. Moreover, Dubey would not respond to her emails asking about the pay cut. During her deposition, Sova admitted that there was a business reason for the pay cut: VD "wanted me to work 49 hours" so AHS had to adjust her pay. The new rate was supposed to be between $10 and $12 an hour. Sova did not acknowledge that the reduced pay rate only lasted one pay period. According to time sheets presented to the court, Sova's next two paychecks reflected base rates of $13.25 and $12.

Sova also became embroiled in VD's guardianship/conservatorship matter in the probate court, although she tried to minimize her role at her deposition. In July 2018, VD began efforts to have his sister removed as his guardian. Sova told a couple of her coworkers that she was "trying to hook [VD] up with a lawyer" to assist him in that matter. Sova claimed, "I didn't know much. I took him to a couple court cases [sic], and that was about it." She explained that whichever caregiver was on duty would transport VD to court.

But in the same deposition, Sova also stated, "I attempted to be his guardian."

> *Q*. And tell me how that came about.
>
> *A*. . . . He asked me if I would be his guardian, and I said, "Well, I can put in for it, if you like." So I put in for it, and I think it was the probate court that does that.
>
> *Q*. How did you put in for it?
>
> *A*. Oh, I just pretty much told them - - well, he did. He said that he would like me as his guardian, and the judge said, "Well, we'll put her down here, but right now I think what we need to do is appoint a court-appointed guardian." And that was the end of that.
>
> *Q*. Did you ask your supervisor's permission to become a patient's guardian?
>
> *A*. No.
>
> *Q*. No? Why not?
>
> *A*. I never felt like I had to, I guess, to be honest.

Sova admitted that she did not raise the issue of abuse in the probate court, explaining that she did not "know who to talk to" and that she just "sat in the courtroom . . . . I didn't have any contact with the judge, or I didn't have any contact with anybody else." VD ultimately was successful; his sister was removed and the court appointed a neutral guardian—"Carol"—in her place.

Sova described that she and her fiancé became personal friends with VD. They took VD fishing. Her fiancé would visit and play cards with VD. Carol was upset that Sova purchased tickets for a monster truck show in St. Ignace and took VD without asking permission. Sova did

not notify AHS about this outing either; "what I thought was, they have the right to . . . go out if they want to. A friend - - you know, like a friend comes over - - a friend can come over; a friend can go out." She explained that the friendship was not unusual because VD had grown up with her brother.

On October 29, 2018, Sova began a medical leave of absence for heart-related problems. The next day, Dubey notified Sova that VD's "family did not want" her serving as VD's caregiver. She was instructed "not to have contact with him through emails, telephones or stopping by on his property." Dubey advised Sova that the family made this decision "because of court things that I was going through with him." AHS asserted that Carol also played a role in the decision.

While on medical leave, Sova sent Dubey several emails to keep her apprised of her condition. Dubey made no response. On January 12, 2019, Sova notified Dubey by email that her doctor released her to work. Dubey responded on January 18 that Sova would be assigned to assist a client in Harbor Springs. Dubey sent Sova a month-long schedule. When Sova appeared for her first day of work on January 31, another aide was already there. That aide informed Sova that she was no longer scheduled to work in that household. Dubey told Sova only that the client "didn't need any service," and did not provide an alternate schedule for Sova.

On February 6, 2019, AHS terminated Sova's employment. Sova testified:

> [Dubey] called me along with Chris [Skogen][3] that was there, and she said, "Hi, Paula. This is Michele, and I'm here with Chris, and I'm just letting you know that we are going to separate you from the company. There are two clients that we have that do not want you working for them again. And I'm sorry, but I was going to separate you on the 2nd, but I got busy, and I couldn't do it, so I'm doing it now." And I said, "Does that mean that I'm fired?" And she said, "Yes it does."

Despite her clear recitation of the reasons cited by Dubey in the phone call, Sova asserted in her affidavit, "Strangely, I then received a phone call on February 6, 2019 from Michele Dubey informing me that I was fired from [AHS] and she would not provide any reason or explanation."

Sova surmised that one of the clients who no longer wanted her services was Jennifer Joneson. She asserted that AHS made this declaration at her deposition. This is untrue. Sova named Joneson in her interrogatory answers as a potential witness. When asked about her relevance, Sova recounted that Dubey

> told me that there was two clients that didn't want me at their house to take care of them anymore. And one was already out of the picture. So it only left two. So Jennifer would have been another one, and I'm friends with Jennifer, and they're in my wedding. So that's one reason why I've got her down as of the people to call.

---

[3] Chris Skogen is the president and CEO of AHS.

. . . And one of them was [VD], and I know the reasons why for that one. And the other one I only worked there a couple times, and the other one would have been [Joneson].

When AHS's counsel circled back to the issue raised by Sova, Sova insisted that if AHS claimed that Joneson did not want her working as a caregiver in her home, "that's a lie." The pair were close and Joneson's family was involved in Sova's upcoming wedding.

## II. PROCEDURAL BACKGROUND

Three months after her termination, Sova filed suit against AHS, alleging that it terminated her employment as retaliation for her filing her abuse report with the state. In her complaint, Sova inaccurately asserted that she first notified her supervisor of the abuse she uncovered, and only filed her report when AHS did nothing "to address or stop the abuse of the client." Thereafter, AHS "began a course of retaliatory conduct against [Sova] as a result of her report(s) of patient abuse to the State of Michigan." And as in her affidavit, but contrary to her deposition, Sova alleged that Dubey informed her of her termination, but not of its cause.

At the close of discovery, AHS sought summary disposition under MCR 2.116(C)(10). AHS contended that Sova failed to demonstrate with admissible evidence a causal connection between her report and her termination or that its cited reasons for her termination were pretextual. AHS noted Sova's testimony that she believed VD's guardian abused him by using vulgar language and that his conservator abused him by denying him access to his money. AHS emphasized Sova's contradictory testimony that VD "often used vulgarities himself, and that was a standard course of interaction with his sister and others" and that she had no direct knowledge of VD's financial situation. AHS further noted Sova's admission that she sought to become VD's guardian without first advising her employer and did not notify the court about her abuse concerns. Sova and her boyfriend also struck up a personal friendship without AHS's knowledge. And on one occasion, Sova violated AHS rules by leaving VD alone while she went to the store.

AHS cited the affidavits of Dubey, Skogen, and another AHS supervisor, Shannon Johnecheck, who attested that Sova's report to the state four months earlier had no part in the termination decision. Rather, "Skogen made the decision to terminate [Sova] based on the removals from client care and concerns regarding her professionalism based on her involvement in [VD's] guardianship proceedings and personal contact with a client of the company." This conduct violated the company's Business Ethics & Conduct Covenant, which required Sova to avoid conflicts of interest.

As there was no direct evidence of retaliatory discharge, AHS argued that a burden-shifting analysis was applicable. But Sova could not demonstrate the requisite causal connection between the report and the termination. A plaintiff must show more than a temporal connection between the protected activity and the termination, and this case lacked even that connection. AHS further contended that Sova acknowledged that she had no evidence to demonstrate that its cited reasons for her termination were pretext. As such, Sova could not establish an illegal motive on her employer's part.

Finally, Dubey contended that there was no evidentiary basis for naming her as a separate and individual defendant. There was no evidence that Dubey, rather than Skogen, made the decision to terminate Sova's employment.

Sova began by challenging the admissibility of the affidavits presented by the defense. None contained the attestation language required by MCR 2.119(B)(1) and all were based on hearsay, Sova argued, so they could not be considered. Sova then contended that AHS "named" Joneson at her deposition as the second patient who requested Sova not to return, and that she had evidence that this was untrue.

Sova then dove into a completely irrelevant area—"the proliferation of abuse and neglect cases involving care at all sorts of facilities"—claiming that AHS was guilty of not adequately supervising its front line employees to prevent patient abuse. In support of this accusation, Sova presented a photograph of another caregiver drinking alcohol while on the job. Sova asserted that the caregiver "also attempted to ply the brain damaged patient with alcohol." But this was not the abuse reported by Sova; the abuse Sova reported pertained only to the guardian and conservator who were completely unrelated to AHS.

Sova claimed that one week after she filed her report, AHS "reduced her pay and began a pattern of retaliatory conduct that finally led to her discharge while providing no reason for it at all, but now apparently the employer claims as contrived reason without evidentiary support for their motion." Sova argued that she asked why her pay was cut, and was given no reason. And Sova repeated her claim that Dubey communicated her termination but would not give a reason for the decision.

AHS responded with Sova's statements at her deposition that contradicted her motion response. Specifically, AHS emphasized that Sova had not reported abuse on its part. Moreover, AHS focused on Sova's own deposition testimony that Dubey explained that her termination was based on her removal from two client accounts, and therefore did not refuse to provide an explanation. Sova also "confirmed at her deposition" that she knew requests for her not to return were made at VD's home and at American House. AHS further noted that Sova had named Joneson at her deposition; AHS did not introduce her name and never claimed that Joneson asked for her not to return as a caregiver. Overall, AHS contended that Sova could not create a factual dispute by submitting an affidavit to contradict her earlier deposition testimony.

At the summary disposition hearing, defense counsel addressed Sova's challenge to the affidavits it presented. The court rules do not "require specific magic language" of attestation, counsel noted. And any hearsay statements included in the affidavits were not intended to prove the truth of the matter asserted, only the effect on the listener.

The circuit court granted summary disposition in AHS's favor. The court rejected Sova's challenge to the defense witnesses' affidavits. The court rule language did not require any particular attestation language; it need only "show affirmatively" that the affiant can testify competently about the matters within.

The court quickly resolved Sova's claims against Dubey. Sova admitted at her deposition that she merely assumed that Dubey played a role in deciding to terminate her. There was

absolutely no evidence that Dubey was a decision maker, and so Sova's claims against her were baseless.

As for Sova's claims against AHS, the court accepted that she took a protected action. But there was no evidence that AHS reduced Sova's pay in retaliation. Indeed, Sova admitted at her deposition that she understood her pay had to be reduced to accommodate her new 49-hour work week. And her pay stubs supported that Sova's pay cut to $9.25 an hour was brief and quickly rectified.

As to the termination decision, Dubey had originally scheduled shifts for Sova upon her return from medical leave, but Skogen expressed concerns with Sova's performance. Skogen, Dubey, and Johnecheck "discussed several issues about [Sova's] professionalism," including her "involvement in [VD's] guardianship proceedings, [Sova's] boyfriend visiting [VD's] home, and [Sova's] 'removal from client care cases.' " The issue of Sova's abuse report did not come up in the conversation according to the witnesses. The court discredited Sova's claim that no reason was given for her termination, citing Sova's own deposition testimony to the contrary. The court warned that Sova could not create factual issues by denying her own statements made under oath.

The court continued:

> [Sova] fails to establish a *prima facie* case of retaliation. Her reduced pay coincides with a change in her schedule, which was alleviated two weeks later after conferring with one of her supervisors. Her claims that other workers ignored her omits both the conversation with Ms. Johnecheck and the fact that she was on leave during a significant portion of the time in question. She admits during her deposition that she was given a basis for her termination at the time she was let go. And [Sova] fails to show that Mr. Skogen, who is responsible for the decision to separate her from the company, had "objective notice" of the email she purportedly sent to the State.
>
> Even if [Sova] could establish a *prima facie* case, [AHS] clearly establish[es] a legitimate business purpose for terminating her employment. [Sova] does not raise a genuine issue of material fact whether that purpose was mere pretext for her firing. . . .
>
> [Sova] cared for three individual clients (including [VD]), plus worked at American House. When she was terminated, she was informed that two clients plus American House did not want her to return to their care. [Sova] provides an affidavit of one client, Ms. Joneson, who states she did not complain about [Sova]. This does not create a genuine issue of material fact whether the other two clients did make such complaints.
>
> * * *
>
> [Sova] had other issues with professionalism as well. She left a client alone while she went to the grocery store on a work shift. On her personal time, [Sova] and her fiancé took a client to a monster truck show, without first getting the permission of the client's guardian.

All three [defense witnesses'] Affidavits establish legitimate business reasons for [Sova's] termination. These reasons are further supported by [Sova's] own testimony. Her claim that she was never informed of why she was terminated, her purported basis for showing pretext, is clearly contradictory to her deposition testimony.

Sova now appeals.

## III. ANALYSIS

We review de novo a circuit court's grant of summary disposition. *Zaher v Miotke*, 300 Mich App 132, 139; 832 NW2d 266 (2013). Summary disposition is appropriate under MCR 2.116(C)(10) when, after reviewing all the evidence "in the light most favorable to the nonmoving party," there remain no genuine issues of material fact and "the moving party is entitled to judgment as a matter of law." *Id*. (cleaned up). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v General Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

## A. AFFIDAVITS

On appeal, Sova continues to challenge the defense witnesses' affidavits. When faced with a motion for summary disposition, the ruling court many only consider "substantively admissible evidence." *Barnard Mfg Co v Gates Performance Engineering, Inc*, 285 Mich App 362, 373; 775 NW2d 618 (2009). Only the substance of the evidence is considered; the evidence need not be presented in an "admissible form" at the summary disposition phase. *Id*.

MCR 2.116(G)(6) provides that an affidavit submitted in support of a motion for summary disposition "shall only be considered to the extent that *the content or substance* would be admissible as evidence to establish or deny the grounds stated in the motion." (Emphasis added.) MCR 2.119(B)(1) governs the form of affidavits submitted to a court as follows:

If an affidavit is filed in support of or in opposition to a motion, it must:

(a) be made on personal knowledge;

(b) state with particularity facts admissible as evidence establishing or denying the grounds stated in the motion; and

(c) show affirmatively that the affiant, if sworn as a witness, can testify competently to the facts stated in the affidavit.

Sova argues that affidavits must "contain the required certifications." And she contends that Johnecheck's affidavit "does not even indicate a date it was signed, or notarized." A notary stamped and signed Johnecheck's affidavit. However, the notary forgot to insert the date into the preprinted affidavit provision included by counsel. It therefore reads: "Subscribed and sworn to before me on January __, 2020."

This omission was not fatal. The Michigan notary public act requires notaries to include "[t]he date the notarial act was performed" when notarizing a document. MCL 55.287(2)(e). The date is part of the "jurat," "a certificate evidencing the fact that the affidavit was properly made before a duly authorized officer." *Wise v Yunker*, 223 Mich 203, 206; 193 NW 890 (1923) (cleaned up). An imperfect jurat does not demand omission of the underlying document. Indeed, the Michigan Supreme Court has held that the omission of the date in a jurat " 'was not such a defect as rendering the proceedings void. The affiant signed and filed with the justice a proper affidavit. The neglect of the justice to fill in the date was not fatal.' " *Id*. at 207, quoting *Van Allen v Sprague*, 206 Mich 116, 119; 172 NW2d 532 (1919). The affidavit in this case is distinguishable from cases holding affidavits invalid because those affidavits completely lacked a jurat. See *Holmes v Mich Capital Med Ctr*, 242 Mich App 703, 710-711; 620 NW2d 319 (2000). The lack of a date in a preprinted notary form does not dictate exclusion of the affidavit from the court's consideration.

To support a motion for summary disposition, a party must make sworn statements in a notarized affidavit affirmatively showing that the witness "could testify competently to the facts stated in the statements." *Tate v Botsford Gen Hosp*, 472 Mich 904, 904; 696 NW2d 684 (2005). Sova fails to identify the magical language of certification that she expected to see in the affidavits of Johnecheck, Dubey, and Skogen. And we uncovered no court rule or statute requiring specific language. Rather, the affidavit must simply "show affirmatively that the affiant, if sworn as a witness, can testify competently to the facts stated in the affidavit." MCR 2.119(B)(1)(c). The witnesses described particular facts within their specific knowledge bases. The witnesses also stated that they been "duly sworn" and "depose[d]." This was adequate for the court's consideration.

Sova further complains, "most of what is set out in the statements constitute inadmissible hearsay and/or reference to inadmissible hearsay," while other averments "simply state conclusions, some reached by others not identified and other conclusions based upon hearsay without describing the source of same." (Emphasis omitted.)

> [A]ffidavits must be made on the basis of personal knowledge and must set forth with particularity such facts as would be admissible as evidence to establish or deny the grounds stated in the motion. Opinions, conclusionary denials, unsworn averments, and inadmissible hearsay do not satisfy the court rule; disputed fact, or the lack of it, must be established by admissible evidence. [*Marlo Beauty Supply, Inc v Farmers Ins Group of Cos*, 227 Mich App 309, 321; 575 NW2d 324 (1998).]

In the affidavits, the witnesses assert that VD's guardians, conservator, or family members asked to have Sova removed from his care team and that the American House CEO asked them not to assign Sova to work with patient's in that facility. These statements are not hearsay. " 'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). The defense did not present these statements to prove the truth of the matter asserted. Rather, the defense was attempting to show the effect of those statements on the witnesses; that the statements impacted

the termination decision.[4]  The circuit court was precluded from considering the statements for this proper purpose.  Accordingly, Sova is not entitled to reconsideration without the challenged evidence.

## B. GENUINE ISSUE OF MATERIAL FACT

Sova also challenges the substance of the circuit court's dismissal of her claims.  An action for retaliatory discharge in violation of the WPA is governed by MCL 15.362 as follows:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee . . . reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false . . . .

The WPA was enacted to protect "employees who report a violation or suspected violation of state, local, or federal law. . . ." *Whitman v City of Burton*, 493 Mich 303, 312; 831 NW2d 223 (2013) (cleaned up).  "The [act] furthers this objective by removing barriers that may interfere with employee efforts to report those violations or suspected violations, thus establishing a cause of action for an employee who has suffered an adverse employment action for reporting or being about to report a violation or suspected violation of the law." *Id*.

A plaintiff may establish a prima facie case of retaliatory discharge under the WPA "by showing that (1) the plaintiff was engaged in protected activity as defined by the act, (2) the defendant took an adverse employment action against the plaintiff, and (3) a causal connection exists between the protected activity and the adverse employment action." *Debano-Griffin v Lake Co*, 493 Mich 167, 175; 828 NW2d 634 (2013) (cleaned up).  This showing can be made by direct or circumstantial evidence.  Where, as here, the plaintiff must rely on circumstantial evidence from which the factfinder could infer that he or she suffered unlawful retaliation, a burden-shifting analysis applies. *Id*. at 176.  The burden shifts to the defendant to articulate a legitimate business reason for the adverse employment action. *Id*.  If a defendant does so, the burden returns to the plaintiff to establish that the legitimate reason offered by the defendant was merely a pretext for the adverse employment action. *Id*.

There is no dispute that Sova engaged in a protected activity.  " 'Protected activity' under the WPA consists of (1) reporting to a public body a violation of a law, regulation, or rule; (2) being about to report such a violation to a public body; or (3) being asked by a public body to participate in an investigation." *Chandler v Dowell Schlumberger Inc*, 456 Mich 395, 399; 572

---

[4] Sova does not identify the challenged conclusory statements made in the affidavits.  We have no duty to make her argument for her. *Seifeddine v Jaber*, 327 Mich App 514, 521; 934 NW2d 64 (2019).

NW2d 210 (1998). Sova engaged in a protected activity by making a report of abuse to the proper state authority. Although Skogen might not have known of Sova's report, Dubey was fully aware.

AHS took adverse employment actions against Sova as well. Sova presented evidence that her hourly wage was reduced and that she was eventually terminated, both after the report was filed.

The question is whether Sova created a genuine issue of material fact that a causal connection existed between the protected activity and the adverse employment action. AHS certainly knew that Sova made this report; Sova forwarded the email report to Dubey the same day. And Sova's pay was reduced, even if only temporarily, and she was subsequently terminated.

The burden shifted to AHS to present a legitimate business reason for Sova's termination. AHS met that burden. But Sova did not meet her burden of demonstrating that AHS's cited reasons for its decisions were mere pretext.

When AHS hired Sova, she signed a "Business Ethics & Conduct Covenant." The covenant included a "Conduct Standard" entitled "Conflicts of Interest." That standard provides:

> b. Each employee shall perform his/her job duties free of conflict arising from regard for his/her own personal gain, profit, or advantage . . . .
>
> * * *
>
> d. Each employee shall perform their job duties free of professional or personal interest that place [AHS] at risk of non compliance with applicable laws and regulations for operation of its business.
>
> e. Employees are required to disclose any possible or actual conflicts of interest so that [AHS] may assess and/or prevent situations that could damage [AHS's] reputation and otherwise result in serious adverse consequences to [AHS] and its employee.

Sova further promised, "I will not go behind the back of the client, family member, or co worker with the intention of challenging the authority of the said person."

Sova also acknowledged receipt of the company's Employee Handbook. The handbook forbids "Leaving your job without proper authorization" and "Loafing or being away from your job unnecessarily." It also provides that AHS can discipline or terminate an employee as a result of "[e]xcessive requests from client(s) for employee to not return to job site."

Sova admitted at her deposition that Dubey informed her that the termination decision was made because "two clients . . . do not want [her] working for them again." In her complaint and affidavit, Sova denied that Dubey communicated the reason for her termination. But a party "may not contrive factual issues merely by asserting the contrary in an affidavit after having given damaging testimony in a deposition." *Klein v Kik*, 264 Mich App 682, 688; 692 NW2d 854 (2005) (cleaned up). And the information conveyed was factually accurate. VD's guardian and family members requested that Sova be removed as his caregiver. The head of the American House in

-11-

Petoskey, where AHS serviced 34 clients, asked that Sova not return to the facility. Sova assumed that Dubey was referring to two clients who received services in their home and went down a rabbit hole of proving that Jennifer Joneson never asked for her removal. But AHS never indicated, even during Sova's deposition, that Joneson asked for Sova's removal as a caregiver.

In their affidavits, Johnecheck, Dubey, and Skogen further alleged that they shared concerns about Sova's professionalism. Sova admitted the facts underlying those concerns as well. Johnecheck asserted that during a well-check at VD's home on September 17, 2018, Sova's boyfriend visited the home. Sova admitted that her boyfriend had become personal friends with VD and visited his home to play cards. Johnecheck asserted that Sova and her boyfriend had taken VD to a monster truck show without requesting permission from VD's guardian. Sova admitted that she took VD and did not believe she needed permission to do so. Dubey asserted that she was concerned with Sova's participation in VD's guardianship proceedings. Although Sova claimed she only drove VD to the courthouse because it was part of her job as a caregiver, she contradicted herself several times in her deposition. Sova described that she tried to help VD find an attorney to represent him in the probate court and when asked by VD, agreed that he could list her as a potential guardian. Sova admitted that she did not ask permission or notify her employer before agreeing to this.

As to the temporary reduction in Sova's pay one week after she filed her report, Sova admitted that it was tied to her schedule change. Sova described at her deposition that VD asked for her to be assigned as his caregiver for 49 hours each week. This required a reduced hourly pay, Sova noted. AHS told Sova that the rate would be between $10 and $12 an hour. For one pay period, however, her rate was reduced to $9.25 an hour. Sova claimed that Dubey refused to answer her messages to correct this error. She also testified that she went to AHS's offices, which were located in the American House facility where Sova was no longer permitted to work, and was very upset trying to find an answer. Regardless of how AHS handled Sova in person, the company increased Sova's pay rate in her next two checks. After that, Sova went on medical leave.

There simply is no evidence that AHS terminated Sova's employment based on her abuse report rather than her own unprofessional conduct. Absent any evidence of pretext, Sova could not overcome AHS's motion for summary disposition.

We affirm.


/s/ Cynthia Diane Stephens
/s/ Stephen L. Borrello
/s/ Elizabeth L. Gleicher

-12-